UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MITCHELL G. ZIMMERMAN,

        Plaintiff,

       v.                                    Case No. 23-C-4

WISCONSIN DEPARTMENT OF
CORRECTIONS,

        Defendant.

---

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

       This case arises under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq*. As applicable in this case, RLUIPA prohibits any governmental entity, including state prisons, from imposing a "substantial burden on the religious exercise of a person . . . confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA further provides that any person who demonstrates that his or her exercise of religion has been substantially burdened by governmental action may sue the government and "obtain appropriate relief," which may include money damages, unless otherwise excepted, as well as declaratory and injunctive relief.

       Plaintiff Mitchell G. Zimmerman, who is representing himself, is currently in the custody of the Wisconsin Department of Corrections (DOC) and confined to a state prison as a sentence for a crime. He alleges that the DOC has a policy or custom of unreasonably delaying the processing of Form DOC-2075, a form used by prisoners to make a "Request for New Religious

Practice or Property." Zimmerman claims that the DOC's delay in processing the form imposes a substantial burden on his religious exercise and thus violates RLUIPA. By way of relief, he seeks an injunction setting firm deadlines within which the DOC must process all Requests for Religious Practice or Property. The case is before the court on the DOC's motion for summary judgment. For the reasons that follow, the DOC's motion will be granted.

## PRELIMINARY MATTERS

After summary judgment briefing was complete, Zimmerman filed a motion for leave to file a sur-reply and a motion to supplement, along with a proposed sur-reply and supplemental materials. Dkt. Nos. 64, 66. He then filed a motion for recruitment of counsel, arguing that an attorney should be recruited to convert his case into a First Amendment claim for damages to incentivize an attorney into taking his case. Dkt. No. 67. Each of these collateral motions will be denied. Zimmerman explains that although his 259 pages of response materials did not address each argument the DOC raised in the moving brief, he did not intend to "concede" or "waive" those arguments. *See id.*; *see also* Dkt. Nos. 58-61. He asks for leave to file a sur-reply and/or a supplement to respond to those arguments he did not originally address in his brief in opposition to the DOC's motion for summary judgment.

Summary judgment briefing generally only consists of a moving brief, a response brief, and a reply brief. Civil L.R. 56(b) (E.D. Wis.). A sur-reply is intended to address <u>new</u> arguments a defendant raised in a reply brief that the plaintiff did not get an opportunity to address in his initial response materials; it is not intended to provide the plaintiff with a second opportunity to respond to arguments he failed or forgot to address. *Merax-Camacho v. United States*, 417 F. App'x 558, 559 (7th Cir. 2011). Zimmerman is an experienced litigator who is well aware of the Federal Rules of Civil Procedure and the district's Local Rules. He has provided no explanation for why he could not and did not fully respond to the DOC's motion in the first instance. In any event, the Court has reviewed the proposed materials and concludes that Zimmerman's sur-reply

2

and supplemental materials would not change the outcome of the case. Zimmerman's supplemental materials consist of only conjecture and speculation regarding matters Zimmerman has no personal knowledge of. Accordingly, Zimmerman's motions to file a sur-reply and/or to supplement are denied.

As for Zimmerman's motion to recruit counsel, the Court notes again, as it did in its previous order denying such a request, that Zimmerman, by his own admission, is an experienced litigator. Dkt. No. 33 at 8 (citing Dkt. No. 29 at 12). His pleadings and filings are quite well written. He clearly is capable of communicating his views to the Court. As for converting the case into a First Amendment claim for damages, it is too late to change the entire theory of the case after the defendant has filed a motion for summary judgment. For these reasons and for the reasons previously stated, the motion for recruitment of counsel will be denied.

## UNDISPUTED FACTS

Zimmerman is an inmate at the Green Bay Correctional Institution. He currently claims to practice a religion called the "Hermetic Philosophy" which follows the "Golden Dawn Tradition." Dkt. No. 4, ¶ 6. According to Zimmerman, this religion holds that human beings are physically manifested through a descent of power from the consciousness of the Gods or Universe. *Id.* There are different stages within this descent which one "climbs through reincarnation, where none of the mystical knowledge gained is ever lost when one undergoes physical death. The ultimate goal is perfect union with the Divine Self, at which point one is freed from the karmic wheel and the need to incarnate further into the body." *Id.* In order to practice his religion, Zimmerman claims he needs various items, including a rug on which he draws numerous spiritual symbols, pictures of Ancient Egyptian deities to be posted on the walls of his cell, tarot cards, and other items and publications. It is the DOC's delay in processing his requests for authorization to obtain various items he claims are used to practice his religion that Zimmerman alleges violates his rights under RLUIPA.

As noted above, RLUIPA prohibits any governmental entity from imposing a "substantial burden on the religious exercise of a person . . . confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Within the DOC, the Division of Adult Institutions (DAI) is responsible for overseeing the state prisons and ensuring that they are operated in compliance with state and federal law. DAI provides inmates with opportunities to pursue lawful religious practices of the religion of their choice.

Given the wide variety of religious practices and the number of religions that are practiced within the Wisconsin prison system, DAI created a policy to manage accommodating inmates' religious practice. Def.'s Proposed Findings of Fact (DPFOF), ¶¶3-4, 6-7, Dkt. No. 50. DAI policy divides religions into Umbrella Religious Groups (URGs) as an administrative tool for managing religious accommodations. There are eight URGs, which correspond to the most common religions. They include Catholic, Buddhist/Other Asian, Humanist/Atheist/Agnostic, Islam, Judaism, Native American/American Indian, Pagan, and Protestant/Other Christian. Each URG incorporates a wide range of various denominations or sub-groups. *Id*., ¶¶4-5. URG designation broadly determines which services or studies inmates may attend and which religious property and dietary accommodations they are eligible to obtain.

In order to maintain institutional order and security in the prisons, the amount and kinds of personal property inmates are allowed to obtain and possess, as well as the sources from which the property is obtained, is limited. Wis. Admin. Code § DOC 309.20. Within the bounds of these limitations, DAI attempts to accommodate inmate requests for articles used in congregate settings and for personal religious practices. DAI Policy 309.61.02 sets out a long list of pre-approved religious property items associated with each inmate's recorded URG. Decl. of Kelli R. Willard, Ex. 1002, Dkt. No. 51-3 at 10-27. But inmates are not limited to the items that have been pre-

4

approved. Inmates may submit a Form DOC-2075 to the Chaplain/designee to request accommodation for religious property that is not on the approved property list. *Id.* at 7. While inmates can only make one request per DOC-2075 form, there is no limit to the number of forms one inmate can submit. DPFOF ¶9.

After an inmate submits a DOC-2075 form, it is reviewed by the Chaplain and Chaplain Supervisor, both of whom make their recommendation for handling the request and forward it to the DOC's Central Office. *Id.*, ¶8. At the Central Office, the Religious Practices Advisory Committee (RPAC) conducts a thorough review of the request and makes a recommendation based on (1) consultation with institution staff; (2) gathering information on typical practices from community spiritual leaders and other publicly available information; (3) the inmate's personal history (e.g., religious preference, other accommodation requests, and conduct); (4) safety concerns (e.g., facility security and public health); (5) existing legal precedent; and (6) the DOC mission (e.g., offender rehabilitation, victim accountability, order, and efficient operations). *Id.*

To comply with the requirements of RLUIPA, RPAC's analysis generally starts with summarizing the inmate's request and reported reasons for why his beliefs require the specific religious property item and/or accommodation. *Id.*, ¶12. RPAC then goes through the inmate's religious preference history (as reported by the inmate throughout his incarceration) and any pertinent criminal history. *Id.* Next, RPAC outlines known compelling governmental interests relevant to the religious accommodation request, before finally offering an assessment of a possible least restrictive accommodation for the stated religious practice. *Id.* RPAC's goal is to say "yes" to as many requests as possible, so it sometimes suggests a modification to typical community practices that would allow the inmate to carry out the religious exercise in a symbolic fashion while still adhering to safety and security protocols. *Id.*, ¶¶12-13. RPAC's recommendation is then forwarded to the facility Warden, who makes the final decision on the request. *Id.*, ¶9. Due to the individualized attention required for each DOC-2075 request, there is

5

no processing deadline for RPAC to submit its analysis and recommendation to the Warden. *Id.*, ¶13.

The dispute in this case involves the amount of time it takes to process a DOC-2075 request. RPAC currently has a backlog of 163 pending DOC-2075 requests, including two from Zimmerman. *Id.*, ¶¶21, 31. The backlog began in 2016 after the Supreme Court's decision in *Holt v. Hobbs*, 574 U.S. 352 (2015), which held that the Arkansas Department of Corrections violated a Muslim inmate's rights under RLUIPA by prohibiting him from growing a half-inch beard in accordance with his faith, notwithstanding the Department's claim that allowing inmates to grow such a beard would undermine the prison's interest in suppressing contraband. *Holt* made clear that in applying RLUIPA's compelling interest standard, courts should not grant undue deference to prison officials' stated justifications for restrictions. *Id.*, ¶¶21, 24. In an apparent attempt to comply with RLUIPA, the DOC has implemented its policies on religious accommodation and pre-approved a long list of articles that inmates may have to exercise their various religions.

Kelli Willard West, the DOC's Religious Practices Coordinator and the chair of RPAC, has worked on processing DOC-2075 requests since 2010. *Id.*, ¶¶3, 15, 18. She explains that, prior to 2016, inmates generally submitted two-to-three sentence requests explaining their accommodation and RPAC may have spent 10 to 15 minutes informally discussing the issue, then drafting a two-to-three sentence hand-written response. *Id.*, ¶18. RPAC would "batch" requests based upon subject matter for information gathering and response. *Id.*, ¶23. It would then address easy requests immediately, while spending more time on complex requests. *Id.* For efficiency, RPAC staff would cut and paste responses to address identical requests. *Id.* Between 2011 and 2015, RPAC received on average 117 requests per year and processed them all within one to three months. *Id.*, ¶¶16, 23. At that time, most requests were denied on the philosophy that it would be unfair to give one inmate or faith group an accommodation which may offer some kind of advantage over others. *Id.*, ¶18.

6

Beginning in 2016, the DOC viewed Supreme Court precedent as requiring individualized RLUIPA analysis on each DOC-2075 form with the objective of finding a way to say "Yes." *Id.*, ¶19. Prior "two-to-three sentence" requests from inmates turned into "pages-upon-pages of supporting documentation," some of which was relevant and some of which was not. But all documentation was required to be reviewed to properly conduct the RLUIPA analysis. *Id.*, ¶20. The volume of DOC-2075 requests also increased to an average of 141 per year. At the end of each calendar year since 2016, RPAC has had anywhere from 40 to 150 pending requests. *Id.*, ¶21. The DOC has been unable to alleviate the backlog, even with increasing staff in 2020 and 2023. *Id.*, ¶¶16, 21-22. Specifically, a 50% Limited Term Employee (LTE) position was added in 2020 and a 60% Full Time Equivalent (FTE) was added in late 2023. *Id.*, ¶22. The DOC is also currently in the process of hiring another full-time position to help with the backlog. *Id.*

With the addition of staff, RPAC developed a two-phase process. *Id.*, ¶25. First, the LTE staff member researches and compiles an initial draft response. *Id.* During this information gathering phase, multiple DOC-2075 forms are concurrently under review (similar to the pre-2016 process that allowed for efficient investigation of requests). *Id.* The prepared drafts are then placed in a folder for individualized review by RPAC. *Id.* West and other RPAC members discuss and modify the response further, if needed, before the response is finalized and submitted to the Warden for final decision. *Id.* The time needed to process a DOC-2075 request depends on the order in which it is submitted, the complexity of the request, and the overall workloads of staff (who have other job responsibilities beyond processing DOC-2075 forms). *Id.*, ¶¶26-28. It does not depend on the religion or any other improper consideration. *Id.*

Zimmerman's conversion to Hermetic Philosophy is the most recent step in what appears to be his lengthy back-and-forth spiritual journey. During his first two periods of incarceration in DOC prisons (November 2006 to September 2007, and then February to May 2008), his religious preference was identified as the Protestant/Other Christian URG. He again identified as

7

Protestant/Other Christian when he returned to prison in July 2011 but then changed to Pagan URG in December 2012. He elected Jewish URG in March 2015, then Pagan again in November 2015, followed by Protestant/Other Christian in January 2018, and then a return to Pagan in November 2018.

Zimmerman has filed a total of 12 lengthy DOC-2075 requests since March 2022. *Id.*, ¶31. RPAC has already reviewed ten of the 12 submissions, many of which were as long as 27 pages. *Id.* The longest gap between Zimmerman's submission of a request and the written decision was 18 months (from March 2022 to September 2023). *Id.*, ¶38. The shortest gap was approximately eight months (from January 2023 to September 2023). *Id.* Zimmerman received accommodation on nearly every single request that he filed. Although Zimmerman's request to permanently "alter" DOC property to practice his religion was denied, he was instead allowed to purchase other commercially available items that satisfied his requests or temporarily use symbols on the DOC property that could be removed once worship was complete. The only request he did not receive accommodation for was his request that his mother be permitted to deposit money in his account without being subject to his debts and obligations (i.e., child support, fines, restitution, court fees, attorney fees, supervision fees, etc.) as required by his religion. *Id.*, ¶¶35-37. Zimmerman's two most recent DOC-2075 requests, received in October 2023, remained pending as of April 2024 because there are currently 130 DOC-2075 requests that were submitted before Zimmerman's two requests. *Id.*, ¶32.

In his original complaint, Zimmerman appeared to allege that the DOC and its officers and employees had violated his rights under RLUIPA by their denial of his requests for religious services and items, and by their failure to process his DOC-2075 forms in a timely manner. He later clarified that his claim is limited to the failure to timely process his DOC-2075 requests, explaining: "In none less than three complaints filed with this Court Plaintiff requests nothing but 'issuance of a declaration that the DOC-2075 Religious Request Process as applied currently,

8

inasmuch as it has no deadlines and takes over a year, was and is a violation of the RLUIPA.' Further requested is an injunction forcing the DOC to establish deadlines not to exceed a certain time established by this Court and that it immediately process Plaintiff's requests stated herein." Dkt. No. 29 at 1-2.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

RLUIPA prohibits a government from imposing a substantial burden on religious exercise unless it can prove that doing so "is the least restrictive means of furthering a compelling governmental interest." *See* 42 U.S.C. § 2000cc(a). To survive summary judgment on a RLUIPA claim, the plaintiff bears the initial burden of proving that the defendant substantially burdened a

9

sincerely held religious belief. *Holt*, 574 U.S. at 360-61. The plaintiff must put forth evidence showing that the defendant's refusal to accommodate his religious request put "substantial pressure" on him to either modify his behavior or violate his beliefs. *Thompson v. Holm*, 809 F.3d 376, 379-80 (7th Cir. 2016); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008).

Once the plaintiff establishes a substantial burden, the burden then shifts to the defendant to show that its conduct was the least restrictive means of furthering a compelling governmental interest. *Holt*, 574 U.S. at 362. The test must be tailored "to the person" seeking relief. *West v. Radtke*, 48 F.4th 836, 847 (7th Cir. 2022). The Court must "look beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id*. "Put simply, [the court] must examine both sides of the ledger on the same case-specific level of generality: asking whether the government's particular interest in burdening this plaintiff's particular religious exercise is justified in light of the record in this case." *Id*.

Zimmerman is not challenging in this case any of the specific decisions rendered on his numerous DOC-2075 Requests for New Religious Practice or Property. Instead, it is the delay in providing a response to his requests that he claims violates RLUIPA. Zimmerman asserts that the delays in processing his religious property requests create a substantial burden on his religious exercise. But this would be true only if the delay, or eventual denial, of his requests would have imposed "a substantial burden" on his "religious exercise." The mere fact that his request was eventually granted does not mean that the delay in granting, or even a denial of his request, imposed a substantial burden. The evidence shows that the DOC is trying to grant requests (say yes) to as many requests as possible simply to avoid being sued. Because Zimmerman has expressly limited his claim in this case to the DOC's failure to promptly process his requests for

10

religious accommodation and has excluded any claim that the denial or delay in granting his requests imposed such a burden, he has waived any claim that the delay in processing his requests violated RLUIPA. Absent such a claim, Zimmerman's case must be dismissed.

Zimmerman disputes the DOC's claim that the delays in processing DOC-2075 requests since 2016 are caused by genuine administrative burden and argues that they are instead the result of an intentional policy to pressure and/or discourage religious practice. But instead of offering any evidence or argument that the delay in approving any specific request he made imposed a substantial burden on his ability to exercise his religion, he simply asks the Court to impose a deadline on the DOC within which any request for religious articles he makes must receive a prompt response. To be sure, an unreasonable delay in granting a request for a religious accommodation can operate as a functional denial and thereby impose a substantial burden on religious exercise in violation of RLUIPA. However, Zimmerman has not shown that they have had such an effect in this case and has made clear that he is not challenging any denial of his multiple requests. He insists that the Court rewrite the DOC's policy without requiring him to first demonstrate that application of the existing policy to him has actually resulted in the violation of his rights under RLUIPA.

That is not how courts are supposed to function. Courts grant relief where a violation of the law has been shown to have caused injury to the plaintiff. They generally do not declare policies unlawful and order their revision based on a showing that they might result in violations of the law. This is especially true in cases involving prisons where the problems "are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974)).

11

Whether the time it currently takes the DOC to process DOC-2075 forms is as a general matter unreasonable is not clear from the record. RPAC has reviewed ten of the 12 DOC-2075 forms Zimmerman submitted, which included 27 pages of materials. RPAC's RlUIPA analysis has totaled 33 pages. Of course, this process is only required where the item requested by the inmate is not included on the long list of pre-approved items. Willard Decl., Ex. 1002, DAI Policy 309.61.02, Dkt. No. 51-3 at 7. And given the variety of requests made, the institutional need for security and order, and the individualized assessment required, it is not surprising that substantial delays can occur. Without looking at what the specific request involved and considering the specific reasons for the delay, the Court is unable to declare the delay unreasonable as a matter of law or that Zimmerman's rights under RLUIPA were violated.

The process of evaluating requests for religious accommodation of other items is made more difficult by the number of religions and religious practices that a prison can be called upon to accommodate. The term "religious exercise" is broadly defined in RLUIPA as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5. Unfortunately, the term religion is not defined. Religion, to the Drafters of the Constitution and the Bill of Rights, had a fairly clear meaning. As James Madison defined it in his 1785 *Memorial and Remonstrance Against Religious Assessments*, religion is "the duty which we owe to the Creator, and the manner of discharging it." James Madison, *Memorial and Remonstrance Against Religious Assessments*, FOUNDERS ONLINE, *available at* https://founders.archives.gov/documents/Madison/01-08-02-0163 (last visited Feb. 27, 2025). At that time, there were few major religions to which people of this country subscribed, each with defined, though varied, creeds and practices. The same is not true today, as is clear from the fact that one of the URGs inmates may choose is Humanist/Atheist/Agnostic.

Caselaw suggests that there can be as many religions and religious practices as there are people. *See Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011) ("A personal religious faith is

entitled to as much protection as one espoused by an organized group."). At the same time, prison officials have a duty to maintain security and order. While sincere religious beliefs and practices must, in the absence of compelling reasons, be accommodated, there is no obligation to accommodate non-religious beliefs or practices. *Id.* "A prison is entitled to ensure that a given claim reflects a sincere religious belief, rather than . . . a prisoner's desire to make a pest of himself and cause trouble for his captors." *Id.* at 594. "And although sincerity rather than orthodoxy is the touchstone, a prison still is entitled to give some consideration to an organization's tenets. For the more a given person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held." *Id.*

The DOC cites numerous district court cases, from around the country, for the proposition that general administrative delays that are "months" long are considered normal and do not amount to a substantial burden. *See, e.g.*, *Watford v. Harner,* No. 18-CV-1313-SPM, 2022 WL 579490, at *8 (S.D. Ill. Feb. 25, 2022), *appeal dismissed*, No. 22-1673, 2023 WL 7174252 (7th Cir. July 6, 2023); *Horacek v. Martin*, No. 2:15-CV-102, 2022 WL 18587785, at *8 (W.D. Mich. Aug. 9, 2022), *report and recommendation adopted,* No. 2:15-CV-102, 2023 WL 333977 (W.D. Mich. Jan. 20, 2023); *Bankston v. Williams*, No. 3:15-CV-01275-NJR, 2020 WL 5517171, at *4 (S.D. Ill. Sept. 14, 2020); *Lambright v. Indiana*, No. 3:18-CV-553-PPS-MGG, 2020 WL 4451075, at *3 (N.D. Ind. Aug. 3, 2020); *Tapp v. Stanley*, No. 04-CV-6400 CJS, 2008 WL 4934592, at *7 (W.D.N.Y. Nov. 17, 2008). Though extreme delays—such as a four-year delay to approve a sweat lodge request and six-year delay to acquire simple religious items—could amount to a substantial burden, such circumstances are "rare." *See, e.g.*, *Byrd v. Haas*, 17 F.4th 692, 698 (6th Cir. 2021); *Haight v. Thompson*, 763 F.3d 554, 560 (6th Cir. 2014).

The delay in processing Zimmerman's requests here span from eight months to eighteen months. In an effort to meet the increased demands of addressing prisoner requests for religious

13

accommodations, the DOC hired two additional staff members, one in 2020 and one in 2023, and is currently in the process of hiring another position. The DOC has also since amended its procedure to process DOC-2075 requests to streamline the investigation of religious requests while still individually considering each request. Zimmerman insists the court should order it to do more. "As a general matter," however, "federal courts should be loath to inject themselves into the day-to-day administration and management of a prison." *Meriwether v. Faulkner*, 821 F.2d 408, 417 (7th Cir. 1987). Judges "are not super-wardens who sit to critique the efficacy or wisdom of prison management choices." *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).

In any event, Zimmerman has failed to present any evidence from which a reasonable factfinder could conclude that the current DOC policy for granting Requests for Religious Practice or Property imposed a substantial burden on his religious exercise. In fact, he has expressly forsworn any attempt to do so. Absent such a showing, he is entitled to no relief under RLUIPA as a matter of law. The DOC's motion for summary judgment will therefore be granted.

## CONCLUSION

For these reasons, the DOC's motion for summary judgment (Dkt. No. 48) is **GRANTED**. Zimmerman's motions for leave to file a sur-reply (Dkt. Nos. 64 & 66) are **DENIED**. Zimmerman's motion for recruitment of counsel for trial (Dkt. No. 67) is **DENIED**. This case is dismissed. The Clerk shall enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 28th day of February, 2025.

William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

15

Case 1:23-cv-00004-WCG   Filed 02/28/25   Page 15 of 15   Document 68